Bohn, J.
On June 12, 1996, this matter was before the court for hearing on the parties’ cross motions for summary judgment.
In his complaint, plaintiff Yusuf Ali (“Ali”) alleges that, while an inmate at Massachusetts Correctional Institution-Shirley (“MCI-Shirley”), defendant officials of the Department of Corrections (“DOC”) violated certain of his constitutional and statutory rights by prohibiting him from observing certain aspects of the Muslim holy month of Ramadan with other Muslim inmates. Most importantly, he asserts that the defendants violated his right, protected by the federal and state constitutions and the Religious Freedom Restoration Act, to the free exercise of his religion. He requests compensatory and punitive damages, and declaratory and injunctive relief.
Defendants assert a number of defenses to liability: those defendants in supervisory positions contend that they cannot be held liable for a decision that was essentially made by a single DOC employee (the DOC’s Muslim chaplain); all defendants assert that Ali cannot show “threats, intimidation, or coercion” in violation of the Massachusetts Civil Rights Act (“MCRA’j; and all defendants assert qualified immunity from suit for damages. Both sides have moved for summary judgment.
For the reasons set forth below, I find that each defendant, except Larry DuBois (“DuBois”), by his or her involvement in the decision to exclude Ali from the celebration of Ramadan, violated the Religious Freedom Restoration Act, which protects the right to free exercise of religion. Ali is entitled to declaratory relief, as well as to damages and attorneys fees in amounts to be assessed at a later trial or hearing. Because I do not believe Ali can prevail on all of his claims (for example, his claim for injunctive relief is now moot), and, because the evidence is currently insufficient to establish amounts of damages and attorneys fees, Ali’s motion for summary judgment is GRANTED in part *33 and DENIED in part. Defendants’ motion, similarly, is GRANTED in part and DENIED in part.
BACKGROUND
Plaintiff Yusuf M. Ali is a Muslim and a member of the Nation of Islam.[3] On January 5, 1995, he was transferred from MCI-Concord to MCI-Shirley, where the incidents in this case took place.
Ali has been a practicing Muslim since 1981. In years prior to his transfer to MCI-Shirley, Ali had observed Ramadan, the Muslim holy month of fasting and prayer, as an important part of his Muslim faith. He had been permitted to do so while incarcerated at other institutions.
In 1995, Ramadan took place during February and March. In order to facilitate inmates’ observance of Ramadan, MCI-Shirley made special dietary, eating, and prayer arrangements for Muslim inmates. For example, inmates were given bagged breakfasts in the evening to bring back to their cells to be eaten before dawn, in accordance with the Ramadan requirement of fasting during daylight hours. In order to take advantage of certain of these arrangements, an inmate’s name had to appear on a list (the “Ramadan list”) prepared by defendant Ibrahim Rahim (“Rahim”), the Muslim chaplain employed by the DOC at MCI-Shirley, and a recognized Imam, or Muslim religious leader.[4]
On January 30, 1995, Ali visited Rahim’s office and requested that Rahim place his name on the Ramadan list. In response, Rahim asked Ali to make a declaration of his faith. Ali stated:
I am a Muslim Believer, I bear witness there is no God but Allah, I bear witness the prophet Ibn Abdullah Mustafa Muhammad is the last prophet and that Elijah Muhammed is the Messenger to the Black man and woman here in North America and now Minister Louis Farrakhan.
Rahim’s response to Ali’s testimonial is in dispute. According to Ali, Rahim said, “I do not recognize you as a Muslim in mainstream Islam and I will not add your name to the list of inmate believers who will observe Ramadan." Rahim denies making that response. In any event, Rahim did not place Ali’s name on the Ramadan list. Rahim now asserts that this was because Ali failed to attend consistently certain Muslim services held on Fridays preceding Ramadan. Ali, in turn, denies both that he failed to attend services consistently, and that this was the reason for Rahim’s decision. Rather, according to Ali, Rahim refused to place him on the list because he did not recognize Ali’s Nation of Islam beliefs as legitimately Islamic. For purposes of my decision, this dispute is not material, as I explain in greater detail in my Discussion, below.[5]
In the following days, Ali took steps to attempt to have his name placed on the Ramadan list. On January 31, Ali spoke with defendant William Coalter (“Coalter”), the Superintendent at MCI-Shirley, and explained what had occurred with Rahim. Coalter told Ali to try to resolve the issue with Rahim, but if this was not successful, to contact Coalter again. On that same day, Ali wrote a letter to Rahim asking him to reverse his decision. Rahim did not respond. Ali wrote a second letter, dated February 9, 1995, addressed to both Coalter and defendant Carol Higgins (“Higgins”), Director of Programs at MCI-Shirley, asking that his name be placed on the Ramadan list.[6] On February 10, 1995, Ali met Coalter at the institution and spoke with him about his letter of February 9. Coalter verbally denied Ali’s request to be added to the list, and told Ali that his designee would be in touch. On February 10, Ali also spoke with Higgins, asking her to speak with Rahim about his exclusion from the Ramadan list. Higgins replied that she would not intervene on Ali’s behalf, but would leave the issue to Rahim’s discretion.[7]
Subsequently, Ali received a memorandum from defendant John Luongo (“Luongo”), Deputy Superintendent at MCI-Shirley. That memo was dated February 10, 1995, either during Ramadan or before it had begun. The memorandum states that the prison would “accommodate” Ali, if Ali were “willing to state Islamic faith as stated by all Muslims." The memorandum then describes some of the aspects in which Ali’s Nation of Islam beliefs reportedly are not legitimately Islamic. The full text of the memo is set out in the margin.[8] Ali refused to comply with Luongo’s suggestions and was not placed on the Ramadan list.
On April 12, 1995, Ali filed the complaint nowbefore the court, asserting that defendants violated the Religious Freedom Restoration Act (“RFRA,” set out at 42 U.S.C. §2000bb); violated G.L.c. 127, §§88, 89, and 90; subjected him to cruel and unusual punishment in violation of the Pt. I, Arts. 1 and 26 of the Massachusetts Constitution; violated the First, Eighth, and Fourteenth amendments to the United States Constitution; violated 42 U.S.C. §1983; violated G.L.c. 12, §§111 and J; and, in general, violated his “rights secured by the constitution of the U.S. and Massachusetts.”
With respect to all of the defendants except DuBois, I hold that Ali is entitled to summary judgment on his claim that defendants violated 42 U.S.C. §2000bb, the “Religious Freedom Restoration Act” (“RFRA”). (Because multiple recoveries under different legal theories are not permitted, I do not discuss Ali’s other theories of recovery.) Ali is entitled to a declaration of his rights, and to damages and attorneys fees in amounts to be assessed at a later trial or hearing. Of course, because he is no longer incarcerated, he is not entitled to the injunctive relief he requests.
With respect to defendant DuBois, I hold that Ali has not made a sufficient showing that, as supervisor of the other defendants, DuBois is liable to Ali under any of Ali’s legal theories.
*34 In accordance with these rulings, summary judgment is therefore GRANTED in part and DENIED in part for Ali and for the defendants.
DISCUSSION
I. Standard for granting summary judgment
This court grants summary judgment where there are no genuine issues of material fact and the summary judgment record entitles the moving party to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat'l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c), 365 Mass. 824 (1974).The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the summary judgment record entitles him or her to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). A parly moving for summary judgment who does not bear the burden of proof at trial demonstrates the absence of a triable issue either by submitting affirmative evidence negating an essential element of the nonmoving party’s case or by showing that the nonmoving party is unlikely to submit proof of that element at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). The nonmoving party cannot defeat the motion for summary judgment by resting on its pleadings and mere assertions of disputed facts. LaLonde v. Eissner, 405 Mass. 207, 209 (1989). Establishing the absence of a triable issue requires the nonmoving party to respond by alleging specific facts demonstrating the existence of a genuine issue of material fact. Pederson v. Time, Inc., supra at 17.
II. Defendants Coalter, Luongo, Higgins, and Rahim violated 42 U.S.C. §2000bb, the “Religious Freedom Restoration Act” (“RFRA”).
The undisputed facts show that each defendant (with the exception of DuBois), by his or her involvement in the decision to prohibit Ali from observing certain aspects of Ramadan with other Muslim inmates, violated the Religious Freedom Restoration Act (42 U.S.C. §2000bb).
That statute sets out the standard according to which state action must be evaluated to determine whether it violates a plaintiffs right to free exercise of religion. It provides, in relevant part, that:
Government may substantially burden a person’s exercise of religion only if it demonstrates that application of the burden to the person—
(1) is in furtherance of a compelling governmental interest, and
(2) is the least restrictive means of furthering that compelling governmental interest. 42 U.S.C. §2000bb-l(b) (emphasis supplied).
This statute was intended to reverse the effect of the United States Supreme Court’s 1990 decision in Employment Division v. Smith, 494 U.S. 872, adopting a less stringent standard for the review of state action. Under 42 U.S.C. §2000bb, Congress directs courts to return to the Supreme Court’s earlier, “compelling interest” test, set out in Wisconsin v. Yoder, 406 U.S. 205 (1972), and Sherbert v. Verner, 374 U.S. 398 (1963). See 42 U.S.C. §2000bb(a) and (b).
I agree with Rahim’s claim that in the present case, the defendants (except DuBois) violated RFRA, because their actions — in preventing him from observing certain aspects of Ramadan — imposed a substantial burden on his exercise of religion, without furthering a compelling governmental interest. I find this to be the case, whether Chaplain Rahim based his decision to exclude Ali on Ali’s alleged failure to attend Friday services consistently, or on his concern that Nation of Islam beliefs were not legitimately Islamic. I will first explain how the exclusion of Rahim violated RFRA; I will then explain how the actions of each defendant, with the exception of DuBois, contributed to that exclusion.
A. Defendants’ actions imposed a “substantial burden” on Ali’s free exercise of his religion.
The threshold question in this case is whether defendants’ actions imposed a burden, “substantial” or otherwise, on Ali’s exercise of his religion. I find that they did. Moreover, defendants’ actions were a “substantial” burden on that exercise.
Courts have articulated various understandings of what constitutes a “substantial burden” on the exercise of religion. In this Commonwealth, the Massachusetts Supreme Judicial Court (“SJC”) has noted that the standard applied by Massachusetts courts to claims arising under Art. 46, §1, of the Amendments to the State Constitution, “seems to be the same as that prescribed by the Religious Freedom Restoration Act.” Attorney General v. Desilets, 418 Mass. 316, 322, n.5 (1994). Thus, I look to Article 46 decisions to determine the nature of a “substantial burden.” In Desilets, the SJC found a “substantial burden” where a statute made the practitioners’ exercise of their religion more difficult and more costly; where it affirmatively obliged them to act contrary to their religious beliefs, and provided for significant sanctions if they did not do so; and where “their nonconformity to the law and any related publicity may stigmatize [them] in the eyes of many.” Desilets, 418 Mass. at 324. Elsewhere, the SJC has summarized the United States Supreme Court as holding that “a ‘substantial burden’ is one that is coercive or compulsory in nature” (citations omitted). Curtis v. School Committee of Falmouth, 420 Mass. 749, 761 (1995).[9] Here, Ali’s exclusion from the Ramadan list was undisputedly a “substantial burden” under either Desilets or Curtis. The exclusion made it more difficult for Ali to exercise his religion, because he was prevented from observing what he takes to be one of its central rituals. Luongo’s response to Ali’s request to be allowed to observe Ramadan essentially ordered him to adopt the tenets of orthodox *35 Islam or remain off the Ramadan list — in so doing, it attempted to oblige him, in a “coercive” or “compulsory” way, to act contrary to his religion. Finally, Ali contends, without opposition from defendants, that he was stigmatized in the eyes of other Muslims by his exclusion from the observance of Ramadan.
For all of the reaspns set out above, I find that the exclusion of Ali from the Ramadan list constituted a substantial burden on Ali’s right of free exercise. I now turn to the other elements of RFRA.
B. Refusing to place Ali on the list of Ramadan participants did not further a “compelling governmental interest.”
As noted above, RFRA is violated where state actors substantially burden a practitioner’s free exercise of his religion, and where that burden was not the “least restrictive means” of furthering a “compelling governmental interest.”
The only arguably compelling interest asserted by defendants is institutional security. In answer to interrogatories, Rahim and DuBois state:
“The plaintiffs security could have become an issue of security concern if he was shown preferential treatment by not having to comply with the rules applied to the rest of the inmate population.” Defendant Ibrahim Rahim’s Answers to Plaintiff Yusuf M. Ali’s Interrogatories, Ans. no. 19; Defendant Larry E. DuBois’s Answers to Plaintiff YusufM. Ali’s Interrogatories, Ans. no. 19.
Defendants are correct that maintaining institutional security has been held to constitute a compelling governmental interest. See, e.g., Ochs v. Thalacker, 1996 WL 406201, at *2 (8th Cir. 1996); Lawson v. Singletary, 85 F.3d 502, 512 (11th Cir. 1996), citing to Sullivan v. Ford, 609 F.2d 197 (5th Cir.), cert. den. 446 U.S. 969 (1980); Fawaad v. Jones, 81 F.3d 1084 (11th Cir. 1996); Mack v. O’Leary, 80 F.3d 1175, 1180 (7th Cir. 1996). In this case, however, the claim that defendants made the decision to exclude Ali from the Ramadan list for security reasons rings hollow, where Ali states in his affidavit that “. . . none of the defendants has suggested to me that prison security was a factor in my being denied access to Ramadan observances,” and the only evidence that security was a factor comes in Rahim’s and DuBois’s identical answers to interrogatories submitted after the commencement of litigation.
Cases cited in Ali’s Memorandum in Support of Plaintiff’s Motion for Summary Judgment are instructive on this point. For example, the Sixth Circuit has noted that in order to justify restrictions on religious freedom, “the state must do more than simply offer conclusory statements that a limitation on religious freedom is required for security . . .” Weaver v. Jago, 675 F.2d 116, 119 (6th Cir. 1982). Defendants “cannot merely brandish the words ‘safety’ and ‘security’ and expect that their actions will automatically be deemed constitutionally permissible.” Campos v. Coughlin, 854 F.Supp. 194, 207 (S.D.N.Y. 1994). In this case, defendants Rahim’s and DuBois’s responses to interrogatories (which provide the only evidence that security concerns motivated defendants’ actions) fail to go beyond mere “conclusory” “brandishing.” Finally, in Ward v. Walsh, 1 F.3d 873, 878 (9th Cir. 1993), cert. den. 114 S.Ct. 1297 (1994), the Ninth Circuit makes a persuasive argument about the role asserted security concerns should play in the court’s analysis. Where a prison makes accommodations to facilitate an inmate’s right of free exercise, security problems are always a possibility, because other inmates may resent what they perceive to be “special treatment” for the religious practitioner. Thus, according to the Ninth Circuit, the possibility of this type of security problem should not be dispositive of an inmate’s free exercise claim (as that possibility is present regardless of the validity of such a claim). In Ward, the court reasoned:
The other prisoners might perceive the inmate as being favored if he were provided a special Kosher diet.. . This effect, however, is present in every case that requires special accommodations for adherents to particular religious practices . . . while not irrelevant, it is not in itself dispositive as to whether the prisoner’s denial of a Kosher diet violated the Orthodox Jewish prisoner’s constitutional right of free exercise. Ward v. Walsh, 1 F.3d at 878.
In sum, I find that defendants, on the summary judgment record, are unlikely to be able to prove that they excluded Ali from the Ramadan list in furtherance of a genuine, compelling governmental interest.
C. Even if defendants did act to further a compelling governmental interest, their actions were not the “least restrictive means” of furthering that interest.
Even if maintaining institutional security was defendants’ genuine purpose in excluding Ali, their actions nevertheless violated RFRA, because they did not choose the “least restrictive means” of furthering that purpose. Defendants do not even dispute suggestions made by Ali’s counsel, in Ali’s Memorandum in Support of Plaintiffs Motion for Summary Judgment, that the DOC had other, less restrictive means available to it to resolve any ostensible security concerns (e.g., setting up a separate meal and prayer time for Ali; or posting a guard outside of the Muslim chapel to ensure that Ali would not be disturbed by inmates who might be angry that he was permitted to observe Ramadan).
In sum, the summary judgment record provides no indication that defendants’ actions constituted the least restrictive means of furthering the purpose of maintaining institutional security.
*36 D. Each of defendants Coalter, Luongo, Higgins, and Rahim, acted so as to violate RFRA.
I find that on the facts of this case, defendants Coalter, Luongo, Higgins, and Rahim each acted so as lo violate RFRA.
Defendant Rahim’s violation is the clearest, as he was the person who initially decided that Ali would not be placed on the Ramadan list.
Ali spoke with defendant Coalter on two occasions about his desire to be placed on the list: the first time, Coalter told Ali to resolve the problem with Rahim directly, and the second time, Coalter refused outright to remedy the situation. Coalter may also have read Ali’s letter of February 9, 1995, addressed to Coalter and Higgins, describing his claim.
On or around February 10, 1995, Ali spoke with defendant Higgins, who refused to intervene with Rahim on Ali’s behalf. Higgins, like Coalter, may also have read Ali’s letter of February 9, 1995, addressed to her and Coalter.
Finally, defendant Luongo sent a memo to Ali, dated February 10, 1995, in response to Ali’s written request to be placed on the Ramadan list, essentially asserting that the prison would “accommodate" Ali if he would conform his beliefs to that of orthodox Islam.
I find that each of these defendants acted so as to impose a “substantial burden” on Ali’s free exercise of his religion, without the justification that their actions were the least restrictive means of furthering a compelling governmental interest. Each of these defem dants, therefore, acted in violation of RFRA: on this point, Ali’s motion for summary judgment is GRANTED, and defendants’ is DENIED.
E. Contrary to defendants’ implication, there is no inherent contradiction in accepting Ali’s claim.
As stated above, I find that summary judgment should be entered on Ali’s claim that defendants CoalLer, Luongo, Higgins, and Rahim violated RFRA. In opposition to this conclusion, however, there is an argument on which, I infer, defendants’ position at least implicitly relies.
Ali’s claim is unique in Massachusetts caselaw, in that it asserts that Rahim, who is both a religious official and a state actor, violated his right to free exercise by prohibiting him from taking part in a religious celebration. Acceptance of this claim, it might be argued, leads to a paradoxical consequence: on the one hand, Ali was excluded from the Ramadan list as a matter of Islamic law; on the other hand, the exclusion violated his right to free exercise of Islam. Because these are conflicting propositions, the argument runs, Ali’s claim must be denied.
The problem with this argument (which, if viable, would dictate entry of summary judgment for defendants) is that in order to be persuasive, it must acknowledge the possibility that some decisions by religious leaders employed by the state could constitute impermissible burdens on free exercise. In other words, it cannot always be the case that a religious leader/state actor’s decision should be deemed a “matter of religious law,” such that, as a logical matter, that decision could not be said to burden unlawfully a practitioner’s right to exercise that religion.
Defendants appear to assume that a distinction between acceptable religious decisions (which must be upheld, for fear of the logical consequence described above) and unacceptable ones (which might burden free exercise) could be practicably made by courts. For example, defendants appear to argue that Rahim made his decision to exclude Ali as a matter of Islamic law (and thus, Rahim’s decision was acceptable), rather than, as Ali claims, out of bias against Nation of Islam Muslims (which would, defendants appear to agree, have been unacceptable).
To require courts to make this distinction, however, would essentially be to require courts to decide religious questions: for example, in this case, the court would have to determine whether Rahim’s decision was made pursuant to matter of Islamic law or unacceptable prejudice. Judicial determination of religious questions is generally disfavored, both as a constitutional and as a practical matter. Pielech v. Massasoit Greyhound, Inc., 423 Mass. 534, 540-42 (August 20, 1996).
For a recent discussion of how certain interpretations of RFRA might require courts to engage in such determinations, see, e.g., Mack v. O’Leary, 80 F.3d 1175 (7th Cir. 1996) (Posner, J.). There, the court considered what sort of definition of “substantial burden” the Seventh Circuit would adopt, for purposes of adjudicating RFRA claims. The court ultimately concluded that a definition generous to plaintiffs (i.e., a definition recognizing a relatively broad spectrum of state decisions as imposing “substantial burdens”) is required. Not only is such a definition “more sensitive to religious feeling,” 80 F.3d at 1179, but, more importantly:
. . . the decisive argument in favor of the generous definition of‘substantial burden,’ it seems to us, is the undesirability of making judges arbiters of religious law. 80 F.3d at 1179.
Under the approach adopted by the Seventh Circuit, the key inquiry in evaluating a “substantial burden” claim would be “which religious practices are important to their practitioners and which are not,” 80 F.3d at 1179. A restriction on practices which were important would constitute a “substantial burden.”
Although such an inquiry might be difficult, the court wrote that it would at least avoid the necessity of
*37 having to determine who in the religion is authorized to lay down dogma and what the content of that dogma is,
as the suggested counterargument, discussed above, would apparently have courts do.
The Seventh Circuit’s solution is essentially not to inquire into the theological soundness of the practice in which a plaintiff wishes to engage; rather, it asks only whether that practice was “important” to the plaintiff. This solution, I think, allows courts to distinguish between permissible and impermissible decisions made by religious state personnel, without falling into the paradox discussed above.
In my decision, I have, consistent with this solution, not inquired into whether the practice in which Ali wished to partake (observing the dietary requirements of Ramadan, despite his ostensible absences from pre-Ramadan services) was “really Islamic,” or, conversely, whether Rahim’s decision to prevent him from so partaking was “really Islamic.” Rather, I have considered only whether the practice was important to Ali, a matter which, on the summary judgment record, is not in dispute.
III. Because summary judgment is GRANTED for Ali on his claim that defendants Coalter, Luongo, Higgins, and Rahim violated RFRA, the court need not address the merits of Ali’s other claims against those defendants.
Because I grant summary judgment for Ali on the claim that defendants Coalter, Luongo, Higgins, and Rahim violated RFRA, I need not address the merits of Ali’s other claims against those defendants. If the entry of summary judgment for Ali is overturned on appeal, Ali will have an opportunity, on remand to Superior Court, to reargue both his RFRA and his other claims. Thus, I find that my decision to address only his RFRA claim will not prejudice Ali.
IV. Defendants Coalter, Luongo, Higgins, and Rahim are not entitled to qualified immunity from suit for their RFRA violations.
Defendants assert that they enjoy a qualified immunity from suit for any violation of 42 U.S.C. §1983 they may have committed. Although my decision grants summary judgment for Ali (against defendants Coalter, Luongo, Higgins, and Rahim) on Ali’s RFRA, rather than on his §1983 claim, I address the issue of qualified immunity briefly, because it appears from the caselaw that qualified immunity may be available as- a defense in civil rights actions other than those under §1983.[10]
In civil rights actions under the Massachusetts Civil Rights Act and 42 U.S.C. §1983, and, I assume, under RFRA, state actors sued in their individual capacities are protected by a “qualified immunity” from suit if their actions (1) were discretionary and (2) did not violate “clearly established statutory or constitutional rights of which a reasonable person would have known.” Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).
In this case, Coalter’s, Luongo’s, Higgins’, and Rahim’s actions were “discretionary,” for purposes of the defense of qualified immunity. The United States Supreme Court has held that “[a] law that fails to specify the precise action that the official must take in each instance creates only discretionary authority.” Davis v. Scherer, 468 U.S. 183, 196-197, n.14 (1984). Because these four defendants’ actions were taken pursuant to such a nonspecifying law (or, described differently, because their actions were not taken pursuant to a law specifying exactly how they should act), their actions were discretionary.
However, despite the discretionary nature of their actions, defendants do not enjoy qualified immunity, because the right violated by their decision to exclude Ali was, at the time of the RFRA violations, “clearly established.”
In order for a right to be considered “clearly established,” it need not be the case that the state actor who allegedly violated that right be familiar with the particular statute (here, RFRA) under which plaintiff sues. Rather, it is enough that a reasonable actor would have been aware that his behavior violated some constitutional right of the plaintiffs. This was the case here.
Although the United States Supreme Court has changed its understanding of what constitutes a violation of free exercise (leading to the enaction of RFRA), the Massachusetts SJC’s understanding has remained constant. See Attorney General v. Desilets, 418 Mass. 316, 321, 322 n.5 (noting that the Massachusetts standard for free exercise claims is the same as that articulated in RFRA and in earlier United States Supreme Court jurisprudence, and noting that Massachusetts has applied that standard continuously, despite the U.S. Supreme Court’s change of heart). Thus, because the Massachusetts standard governing violations of free exercise is of longstanding duration (although embodied relatively recently in RFRA), defendants Coalter, Luongo, Higgins, and Rahim are not immune from suit for the violations that occurred here.
V.Ali is entitled to recover damages and attorneys fees from defendants Coalter, Luongo, Higgins, and Rahim; he is also entitled to declaratory relief.
A. Compensatory damages
Under RFRA, Ali is entitled to recover compensatory damages from Coalter, Luongo, Higgins, and Rahim. Because the summary judgment record is not sufficiently detailed to allow me to make a finding as to the amount of damages, however, I order that the amount be determined at a separate trial or hearing.
*38 B.Attorneys fees
In addition, Ali is entitled under RFRA to recover attorneys fees from those defendants, again in an amount to be determined at a separate trial or hearing. 42 U.S.C. § 1988(b) (prevailing RFRA claimant entitled to attorneys fees).
C. Punitive damages
I also find that Ali may be permitted to recover punitive damages under RFRA, subject to his making a certain showing (described below) at a separate trial or hearing on damages.
Neither Massachusetts caselawnor that from other jurisdictions (federal or state) has expressly addressed the issue of whether a plaintiff may recover punitive damages under RFRA. In Massachusetts, the general rule is that “(p]unitive or exemplary damages are not allowed . . . except under statutory authority.” Santana v. Registrars of Voters of Worcester, 398 Mass. 862, 867 (1986) (citation omitted). See also Pidge v. Superintendent Massachusetts Correctional Institution, Cedar Junction, 32 Mass.App.Ct. 14, 19 n.9 (1992) (plaintiff not entitled to punitive damages in the absence of explicit statutory authorization, even for a claimed deprivation of constitutional rights (complaint included a count under §1983)). However, in actions under 42 U.S.C. §1983 (which does not expressly provide for recovery of punitive damages), Massachusetts courts have held that punitive damages are permitted:
Punitive damages are recoverable in a §1983 suit where the defendant’s conduct is motivated by an evil motive or intent, or where it involves reckless or callous indifference to the plaintiffs federally protected rights. Miga v. Holyoke, 398 Mass. 343, 355 (1986) (citing to Smith v. Wade, 461 U.S. 30, 50-51 (1983); and Clark v. Taylor, 710 F.2d 4, 14 (1st Cir. 1983). [11]
Because RFRA and §1983 were both enacted for the purpose of protecting plaintiffs’ rights under the United States Constitution, I find that under Massachusetts law, plaintiffs may be entitled to recover punitive damages under RFRA in the same instances as under §1983: where the defendant’s conduct “is motivated by an evil motive or intent, or where it involves reckless or callous indifference to the plaintiffs federally protected rights.”[12]
In Ihe present case, the summary judgment record includes possible instances of behavior constituting, a l the very least, “reckless or callous indifference” to Ali’s rights. However, because the issue has not been briefed by the parties, I decline to decide it now, and order that it be addressed at a later trial or hearing on assessment of damages.
D. Declaratory relief
I note briefly that, although Ali is no longer an inmate at MCI-Shirley, it is nevertheless appropriate for the court to make a declaration to resolve his claims.
We have answered moot questions ‘where the issue was one of public importance, where it was fully argued on both sides, where the question was certain, or at least very likely, to arise again in similar factual circumstances, and especially where appellate review could not be obtained before the recurring question would again be moot.’ Norwood Hospital v. Munoz, 409 Mass. 116, 121 (1991) (quoting Lockhart v. Attorney Gen., 390 Mass. 780, 783 (1984)) (holding that court would issue declaratory relief even though case was moot).
I find that this case is one in which a declaration is appropriately made, despite the fact that Ali himself no longer needs one in order to enforce his rights against defendants. Questions about inmates’ free exercise of religion — and especially about how free exercise claims should be resolved under the relatively recent Religious Freedom Restoration Act — are certainly of public importance; questions about the proper role of religious figures employed by the state are very likely to arise again, especially in the prison context; and the prison context is a paradigmatic one in which plaintiffs are likely to be living in entirely different circumstances before appellate review can be obtained.
VI. With respect to defendant Larry DuBois, Ali’s motion for summary judgment is DENIED and defendants’ motion is GRANTED.
I hold that Superintendent DuBois, in contrast to the other defendants, is not liable to Ali on any of Ali’s legal theories.
Massachusetts courts have not addressed the standards under which a supervisor may be held liable for subordinates’ violations of RFRA or G.L.c. 127, §§88-90. I will assume that the same principles apply to supervisory liability in these cases as apply to civil rights claims under 42 U.S.C. §1983, and I conclude that under those principles, DuBois should not be held liable under any of Ali’s legal theories.
In §1983 civil rights cases (and, I assume, in RFRA and c. 127 cases), the plaintiff, to prevail against, a supervisor:
must establish the official’s ‘personal involvement in the constitutional violation,’ which at a minimum must mean ‘personal knowledge’ of the violation. Martino, 37 Mass.App.Ct. at 719, quoting O’Malley v. Sheriff of Worcester County, 415 Mass. 132, 142-43 (1993).
Here, there is no allegation that DuBois knew of, or had anything to do with, the actions of Coalter, Luongo, Higgins, or Rahim. Compare Wright v. McCann, 460 F.2d 126, 134-35 (2d Cir. 1972) (defendant prison warden admitted to knowing about challenged prison condition). Although Ali’s memorandum in support of his motion for summary judgment asserts that *39 DuBois maybe liable because he “continued to permit” Rahim to act in certain ways, there is no allegation that DuBois actually knew or should have known of Rahim’s behavior, so that he could have attempted to stop it.
Concededly, a supervisor may sometimes be liable where he had no direct involvement in the constitutional violation, for example, where he failed to train his subordinates in a way that would have prevented the violation. The plaintiff must show, however, that the failure to train was the “result of gross negligence amounting to deliberate indifference.” Woodley v. Nantucket, 645 F.Supp. 1365, 1372 (1986). There is no such showing, here.
A supervisor may also be liable where, despite his lack of direct participation in violations by subordinates, there was a link between those violations and “the adoption of any plan or policy . . . —express or otherwise — showing [the supervisor’s] authorization or approval of such misconduct,” Rizzo v. Goode, 423 U.S. 362, 371 (1976), or a pattern or practice of which the supervisor approved, Wright v. McCann, 460 F.2d at 134-35 (defendant warden conceded that challenged prison procedure, of which he had knowledge, was customary). Plaintiffs main claim in the present case is that DuBois did have a policy that contributed to the other defendants’ violations: specifically, DuBois had an “intentional policy of having no written policies concerning inmate participation in Ramadan” (emphasis supplied), such that Rahim was able to exercise relatively unbridled discretion to make decisions like the one Ali challenges here.
I find that Ali has not shown that DuBois’s failure to promulgate a policy constraining Rahim was such that it demonstrated DuBois’s “authorization or approval” of Rahim’s misconduct (or of misconduct similar to Rahim’s). There is no indication on the record that DuBois approved of behavior such as Rahim’s, or was on notice that a policy was needed to curb abuses. Of course, following the incident that led to this lawsuit, and following the issuance of this decision, Dubois will be on notice that formulating such a policy would be well advised. However, I decline to find him liable for the actions that took place in the present case.
ORDER
For the reasons discussed above, plaintiff Yusuf Ali’s motion for summary judgment is GRANTED in part and DENIED in part. Defendants’ motion for summary judgment is also GRANTED in part and DENIED in part. The following orders are to issue:
1.The court DECLARES that defendants William Coalter, John Luongo, Carol Higgins, and Ibrahim Rahim are each liable to the plaintiff, Yusuf Ali, for actions they took to exclude him from observing certain aspects of Ramadan in early 1995. This exclusion violated the Religious Freedom Restoration Act, 42 U.S.C. §2000bb.
2. The court DECLARES that the plaintiff, Yusuf Ali, is entitled to recover damages and attorneys fees from defendants Coalter, Luongo, Higgins, and Rahim, pursuant to 42 U.S.C. §2000bb and 42 U.S.C. §1988.
3. The amount of damages and attorneys fees for which defendants Coalter, Luongo, Higgins, and Rahim are liable is to be determined at a separate trial or hearing.
4. The court DECLARES that defendant Larry DuBois is not liable to the plaintiff, Yusuf Ali, under any of the legal theories set out in the complaint.

 Muslims are practitioners of Islam, one of the world’s major religions. Islam, in its original form, was promulgated by the prophet Mohammed, born in Mecca in the sixth century A.D. and considered by Islamic believers to have been the messenger of God (“Allah”) to mankind. The Quoran, the sacred book of Islam, is believed to contain the word of Allah. (I take judicial notice of some of these facts: others are culled from 12 Encylopedia Britannica 63; 15 Encylopedia Britannica 639 (1968).)
The Nation of Islam is a branch of Islam. It was founded by Elijah Mohammed, considered, in Ali’s words, to have been a “(m essenger to the Black man and woman ... in North America,” a role now played, according to Ali, by Minister Louis Farrakhan.
According to one writer, salient characteristics of the Nation of Islam include the following: it “directs its message mainly to African-Americans,” “renounce[s] alcohol and drug abuse,” is “emphatic about self-discipline, self-sufficiency, and hard work,” and has “become a presence . .. among the disproportionately African-American prison populations.” Lisa A, Kelly, Race and Place: Geographic and Transcendent Community in the Post-Shaw Era, 49 Vand.L.Rev. 227 n.215 (1996).

 Inmates whose names were not on the Ramadan list were not able to receive their breakfasts in the evening; however, they were still entitled to observe some of the requirements of Ramadan. For example, there were apparently Muslim services open to anyone during the month of Ramadan; additionally, according to defendant Rahim, no pork was served at MCI-Shirley during that month.

 I conclude that Rahim’s decision violated the Religious Freedom Restoration Act, whether that decision was based on concerns about Ali’s attendance at services or on bias against members of the Nation of Islam.

 Ali asserts that he also wrote an earlier letter to Coalter, dated February 2, 1995, and attaches that letter as an exhibit to his motion for summary judgment. In his answers to Ali’s interrogatories, also attached as an exhibit, Coalter neither admits nor denies receiving this letter.

 In her answers to Ali’s interrogatories, Higgins states that she does not remember this conversation in particular, but states that she did speak with Ali about “not being an active *40 participant in Muslim services and not being placed on the Ramadan list." She also states that at some point, she told Ali that “he needed to discuss his participation in Ramadan with the Muslim Chaplain.”
I take it to be undisputed that at some point, Ali approached Higgins for assistance, and she referred him to Chaplain Rahim.

 “In response to your claims of religious discrimination!,] we would like to offer the following facts;
a) MCI Shirley makes available religious services to all denominations of Islam through Chaplain I. A. Rahim, Muslim Imam.
b) Your claim to be Muslim has been professionally discredited by a standing Imam.
c) Any Muslim who approaches our Chaplain for [Ramadan] is serviced without regard to denomination.
d) The basic discrepancy with you is that it is impossible to place you in any Islamic denomination at all Therefore, it is concluded you are not Muslim.
e) If you are willing to state Islamic faith as stated by all Muslims with the cooperation of our Chaplain. MCI Shirley will move swiftly to accommodate you.
1) Any of the inmates you refer to as being denied their Islamic rights have yet to come forward and conference [sic] with the Chaplain about their faith.
g) You realize these conferences would be unnecessary if any of you gentlemen were active participants [in] the Islamic ‘Friday’ prayer services coordinated by the institution through (he Muslim Chaplain.
As it stands, until you make definite steps to clarify these issues or [those of] any of your companions, we will be unable lo serve you as we so much wish to.

The teaching of Islam is that God is one and does not come in the form of a human. The teaching of the Nation of Islam is that God came in the form of a man named Farad Muhammadfj and this is contrary to the foundations of all Islamic denominations.

I Thank [y]ou“ (emphasis supplied).

 Other courts expressly interpreting RFRA have articulated similar standards.
The Seventh Circuit, for example, finds a burden to be substantial where it burdens a practice “important” to its practitioners. Mack v. O’Leary, 80 F.3d 1175 (7th Cir. 1996). According to the Tenth Circuit,
To exceed the ‘substantial burden’ threshold, government regulation must significantly inhibit or constrain conduct or expression that manifests some central tenet of a prisoner’s individual beliefs; must meaningfully curtail a prisoner’s ability to express adherence to his or her faith; or must deny a prisoner reasonable opportunities to engage in those activities that are fundamental to a prisoner’s religion. Werner v. McCotter, 49 F.3d 1476, 1480 (10th Cir.) (citations omitted), cert. den. 115 S.Ct. 2625 (1995). See also Thiry v. Carlson, 78 F.3d 1491, 1495 (10th Cir. 1996) (quoting same standard).

 Massachusetts courts have not yet addressed the question of whether the doctrine of qualified immunity should apply to RFRA claims. However, examining decisions on similar issues, I find that the SJC would most likely find that the policies underlying the availability of qualified immunity in §1983 suits should apply to RFRA claims as well. See, e.g., Martino v. Hogan, 37 Mass.App.Ct. 710, 720 (1994), further app. rev. den. 419 Mass. 1106 (1995) (implying that if plaintiff had a cause of action based directly on the Massachusetts Declaration of Rights, rather than only on the Massachusetts Civil Rights Act or 42 U.S.C. §1983, qualified immunity would probably be a defense to that action, as well).

 The Santana and Pidge decisions would seem to contradict the rule expressed in Miga. However, Santana and Pidge do not expressly indicate an intent to change the law governing § 1983 damages; therefore, I assume that Miga’s principle is still viable.

 In the alternative, I hold that under the facts of this case, Ali is also entitled to summary judgment against defendants Coalter, Luongo, Higgins, and Rahim on his §1983 claim. On the alternative basis of this ruling, then, I hold that Ali is entitled under Miga to recover punitive damages, if he can prove evil motive or intent, or reckless or callous indifference, at a later trial or hearing to assess damages.